IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| JOHNNY MATHIS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | No. 5:12-CV-70 (CAR) |
| | : | |
| CAMERON KERRY, | : | |
| Acting Secretary of the United States | : | |
| Department of Commerce, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This action arises from *pro se* Plaintiff Johnny Mathis's employment with Defendant, the United States Department of Commerce, during the 2010 Decennial Census.  Plaintiff contends that Defendant refused to promote him to two different positions and refused to renew his employment because his race (African American), color (black), sex (male), religion (Independent Pentecostal), and national origin and in retaliation for engaging in protected activity, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII").  Plaintiff also asserts a hostile work environment claim under Title VII.

Currently before the Court is Defendant's Motion for Summary Judgment. Having considered the parties' arguments, the record, and applicable law, Defendant's

Motion for Summary Judgment [Doc. 17] is **GRANTED**.[1]

**LEGAL STANDARD**

Summary judgment is proper if the movant "shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law."[2]  Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment.[3]  This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[4]

On summary judgment, the Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party; the Court may not make credibility determinations or weigh the evidence.[5]  The moving party "always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[6]  If the

---

[1] The Court has reviewed the parties' motions and briefs and determined that oral argument would not aid in resolution of Defendant's Motion for Summary Judgment.  Plaintiff's Motions for Oral Argument [Docs. 21 & 24] are therefore **DENIED**.

[2] Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[3] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

[4] *See id.* at 249-52.

[5] *See id.* at 254-55; *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

[6] *Celotex*, 477 U.S. at 323 (internal quotation marks omitted).

moving party discharges this burden, the burden then shifts to the nonmoving party to respond by setting forth specific evidence in the record and articulating the precise manner in which that evidence creates a genuine issue of material fact or that the moving party is not entitled to a judgment as a matter of law.[7]   This evidence must consist of more than mere conclusory allegations or legal conclusions.[8]

As a *pro se* litigant, Plaintiff is held "to a less stringent standard than formal pleadings drafted by lawyers."[9]   Nevertheless, Plaintiff's *pro se* status "does not exempt [him] from compliance with relevant rules of procedural and substantive law," including those applicable on summary judgment.[10]

## BACKGROUND

For purposes of this Motion, the relevant facts in the light most favorable to Plaintiff, the non-movant, are as follows[11]:

---

[7] *See* Fed. R. Civ. P. 56(e); *see also Celotex,* 477 U.S. at 324-26.

[8] *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

[9] *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

[10] *Hillemann v. Univ. of Cent. Fla.*, 411 F. Supp. 2d 1354, 1358-59 (M.D. Fla. 2004), *affi'd* 167 F. App'x 747 (11th Cir. 2006) (internal quotation omitted).

[11] These facts are largely drawn from Defendant's submissions and the Final Agency Decision attached to Plaintiff's Complaint [Doc. 1-1].   Despite the Court's explicit instructions in its November 19, 2013 Order, Plaintiff has filed more than 500 pages of exhibits and only references some 37 pages in his responsive briefs.   [Docs. 21 & 24].   The Court will not review the uncited portions of these exhibits in search of evidence that may advance Plaintiff's position.   *See, e.g., Carolina Acquisition, LLC v. Double Billed, LLC,* 627 F. Supp. 2d 1337, 1340 (S.D. Fla. 2009) ("Federal judges are not archaeologists.... We possess neither the luxury nor the inclination to sift through that mound of obfuscation in hopes of finding a genuine issue of material fact to deny summary judgment."); *Witbeck v. Embry Riddle Aeronautical Univ., Inc.,* 219 F.R.D. 540, 547 (M.D. Fla. 2004) ("That judges have no duty to scour the file in search of evidence is an obvious corollary to the requirement that parties specifically identify the portions of the case file which support their assertions regarding whether genuine issues remain for trial.").

*The Decennial Census*

Defendant, the United States Department of Commerce, is an executive agency comprised of a number of bureaus, one of which is the Bureau of the Census ("Census Bureau").[12]   The best-known activity of the Census Bureau is the constitutionally-mandated Decennial Census, which enumerates every individual living in the United States and identifies his or her place of residence for the primary purpose of apportioning seats in the United States House of Representatives.[13]   Due to the short-term nature of most Decennial Census operations, appointments are temporary, and employees can be released at or before a designated not-to-exceed date.[14]

For the 2010 Decennial Census, Defendant conducted its field operations through twelve temporary regional census centers, including the Atlanta Regional Census Center.[15]   The Atlanta Regional Census Center oversaw a number of local census offices, including the Macon, Georgia Early Local Census Office ("ELCO") through its Regional Director, Assistant Regional Census Manager, and Area Manager.[16]   A Local Census Office Manager ("LCOM") managed each individual local census office.[17]   Generally, each office also employed five assistant managers who reported to the LCOM, including an Assistant Manager of Administration, Assistant Manager of Recruiting, Assistant

---

[12] 13 U.S.C. § 2.

[13] U.S. Const. Art. I, § 2.

[14] Def. Ex. 5, p. 2 [Doc. 17-8].

[15] Def. Ex. 1, p. 2 [Doc. 17-4].

[16] *Id.*; Def. Ex. 3, p. 4 [Doc. 17-6].

[17] Def. Ex. 3, pp. 3, 5.

Manager of Technology, Assistant Manager for Field Operations, and Assistant Manager of Quality Assurance.[18]

**Plaintiff's Census Bureau Employment**

On October 1, 2008, Plaintiff was appointed to the Assistant Manager of Administration position in the Macon ELCO.[19]  Plaintiff's appointment was temporary; there was no guarantee that his appointment would be extended, and he was not eligible for permanent employment with Defendant.[20]  Plaintiff's not-to-exceed date was set for September 30, 2009.[21]

Plaintiff's supervisors changed several times over the course of his employment. William Eaton served as Area Manager and Plaintiff second-line supervisor from March 2008 until April 2009.[22]  Linda McWhorter followed Eaton in April 2009, and Asuncion Desax Guerrero became Area Manager in August 2010.[23]  The Macon LCOM, Plaintiff's first-line supervisor, was Anthony Proffitt from October 1, 2008, until March 26, 2009.[24] McWhorter served as a temporary Acting LCOM from April 14, 2009 until the end of May.[25]  Sarah Ray assumed the LCOM position on June 7, 2009.[26]

Plaintiff's first- and second-line supervisors observed numerous conflicts between

---

[18] *Id*. at 5-6.
[19] Def. Ex. 4, p. 2 [Doc. 17-7]; Def. Ex. 7, p. 2 [Doc. 17-10].
[20] Def. Ex. 5, p. 2.
[21] Def. Ex. 7, p. 2.
[22] Def. Ex. 11, p. 2 [Doc. 17-14]; Def. Ex. 10, p. 2 [Doc. 17-13].
[23] *See* Def. Ex. 8, p. 3 [Doc. 17-11]; Def. Ex. 21, p. 2 [Doc. 17-24].
[24] *See* Pl. Dep., p. 84 [Doc. 19]; Def. Ex. 24, p. 2-3 [Doc. 17-27].
[25] Def. Ex. 21, p. 2.
[26] Def. Ex. 14, p. 3 [Doc. 17-17].

Plaintiff and his fellow employees.   William Eaton, one of Plaintiff's Area Managers, reported that Plaintiff had a confrontational style of communicating with his employees and other managers in the office.[27]   Eaton observed Plaintiff "challenge the instructions and opinions of [Plaintiff's] co-workers and supervisors with some arrogance—to the point of insubordination where [Plaintiff's] LCOM was concerned."[28]   Eaton also asserted that Plaintiff's management style was inconsistent with the ELCO culture, and Plaintiff was disproportionately responsible for creating significant conflict and tension in the office.[29]

Linda McWhorter, an Area Manager and Acting Macon LCOM in April 2009, received similar reports from Plaintiff's staff.[30]   McWhorter noted that Plaintiff "would have [his staff] line up like children in order and give them #2 pencils in order to give them specific instructions about a task or assignment."[31]   On another occasion, McWhorter personally overheard Plaintiff calling his staff "Little Boogers."[32]   On April 29, 2009, McWhorter counseled Plaintiff, Assistant Manager for Recruiting Bob Peterson, and Assistant Manager for Technology Mickey Bumpass for arguing and acting unprofessionally.[33]   According to McWhorter, Peterson's and Bumpass's behavior

---

[27] Def. Ex. 11, p. 2; Def. Ex. 10, p. 3.
[28] Def. Ex. 10, p. 3.
[29] *Id.*
[30] Def. Ex. 9, pp. 3, 5 [Doc. 17-12].
[31] *Id.* at 5.
[32] *Id.*
[33] Def. Ex. 12, p. 2 [Doc. 17-15].

improved after the meeting; Plaintiff's did not.[34]

Plaintiff's conflict with Peterson and Bumpass stemmed from his refusal to hire "their buddies and their friends" and Plaintiff's dealings with LCOM Anthony Proffitt.[35] Proffitt, a close associate of Peterson and Bumpass, "was not in line with Census policies, procedures or manuals."[36]  Proffitt attempted to circumvent hiring policies and failed to reprimand co-workers and staff who were insubordinate to Plaintiff.[37]  Before Plaintiff reported Proffitt's actions to the Area Manager, Plaintiff attempted to discuss Proffitt's failings with him in private.[38]  In response, Proffitt and Peterson told Plaintiff that they "…would like nothing more than to 'take [Plaintiff] out back and beat the shit out of [him].'"[39]  Peterson also stated that he would slap Plaintiff if Plaintiff was appointed to the Macon LCOM position.[40]

Proffitt was ultimately terminated for cause on March 26, 2009.[41]  Peterson, Bumpass, and Proffitt's other supporters held Plaintiff responsible; their "hostility magnified many times over" after Proffitt's termination.[42]  Peterson personally created "a half dozen work place disturbances" by openly cursing at Plaintiff for his job

---

[34] Def. Ex. 9, p. 5.

[35] Pl. Dep., p. 55.

[36] Def. Ex. 27, p. 2 [Doc. 17-30].

[37] *Id.* at 3.

[38] *Id.*at 2.

[39] *Id.*

[40] *Id.*

[41] *See* Pl. Dep., p. 84; Def. Ex. 24, p. 2.

[42] Def. Ex. 27, pp. 2, 3.

performance and causing general "discord and resentment" in the office.[43]

Although unclear, at one point Peterson and Bumpass called Plaintiff a "nigger" and told him he was an "uppity nigger" who had "too much" "authority and power."[44] Another employee told Plaintiff that Proffitt and other managers used racial epithets in reference to the ELCO staff.[45]

On May 13, 2009, Plaintiff applied for the open Macon LCOM position, but another individual, Sarah Ray, was selected.[46]  Later, on July 19, 2009, Michelle Kraus was appointed the Regional Technician position.[47]  Both Kraus and McWhorter notified the new Area Manager, Asuncion Desax Guerrero, of problems with Plaintiff's performance during Guerrero's orientation in August 2010.[48]  On September 29, 2009, Guerrero's supervisor, Assistant Regional Census Manager Allen Wells, dispatched Guerrero to the Macon ELCO to inform Plaintiff that his appointment was expiring on his not-to-exceed date, and his employment would end the following day.[49]

*Administrative Complaint*

On October 23, 2009, Plaintiff contacted Defendant's EEOC office and alleged various claims of retaliation and discrimination on the basis of his race, color, sex,

---

[43] *Id.* at 2-3.

[44] Pl. Dep., p. 56.

[45] Def. Ex. 27, p. 3. Plaintiff does not specify when these racial statements were made or with what frequency.  Reading these facts in the light most favorable to Plaintiff, the Court concludes that his co-workers and supervisor used racial epitaphs on two separate occasions.

[46] *See* Def. Ex. 13, p. 2 [Doc. 17-16]; Def. Ex. 14, p. 3.

[47] Def. Ex. 15, p. 3 [Doc. 17-18].

[48] Def. Ex. 8, p. 3-4; Def. Ex. 16, p. 2 [Doc. 17-19].

[49] Def. Ex. 16, p. 2.

religion, and national origin.[50]  Plaintiff filed a formal EEOC complaint on November 18, 2009, alleging Defendant (1) failed to promote him to the Macon LCOM position; (2) failed to promote him to the Regional Technician position; (3) refused to renew his employment; (4) retaliated against him for engaging in protected activity; and (5) permitted or fostered a hostile work environment, all on the basis of Plaintiff's race, color, sex, religion, and national origin.

On January 15, 2010, Defendant issued a Notice of Partial Acceptance for Investigation letter, informing Plaintiff that it would investigate his allegations of discriminatory termination and his hostile work environment claim.[51]  Defendant dismissed Plaintiff's retaliation claim for his failure to allege participation in a statutorily-protected activity.[52]  Defendant also dismissed Plaintiff's two failure-to-promote claims as untimely counseled.[53]

On November 22, 2011, Defendant issued a Final Agency Decision dismissing Plaintiff's discriminatory termination claim as a matter of law.[54]  It also dismissed Plaintiff's hostile work environment claim for his failure to cooperate with the administrative investigation.[55]

### Proceedings in Federal Court

---

[50] Def. Ex. 17, p. 2 [Doc. 17-20].

[51] *Id.*

[52] *Id.* at 3-4.

[53] *Id.* at 5.

[54] Final Agency Decision, p. 18 [Doc. 1-1].  Defendant states that Defendant issued its decision on November 28, 2011; however the last page of the Final Agency Decision suggests otherwise.

[55] *Id.* at 6.

Plaintiff filed the instant action in this Court on February 28, 2012, and Defendant filed a Motion for Summary Judgment on June 10, 2013.  In its November 19, 2013 Order, the Court outlined Plaintiff's obligation to respond to Defendant's Motion and granted him 14 days to amend his responsive brief with the benefit of the Court's instructions. Plaintiff submitted an untimely amendment to which Defendant replied.  This matter is now ripe for adjudication.

## DISCUSSION

Plaintiff contends that Defendant refused to promote him to the LCOM or Regional Technician positions and ultimately refused to renew his employment due to his race, color, sex, religion, national origin and in retaliation for engaging in protected activity, all in violation of Title VII.  Plaintiff also alleges a hostile work environment claim under Title VII.  In opposition, Defendant asserts that Plaintiff failed to exhaust his administrative remedies and cannot present sufficient evidence to support his claims.  The Court agrees and addresses each of these arguments in turn.

## I.    Administrative Exhaustion

A federal employee must pursue and exhaust his administrative remedies before filing a Title VII claim in federal court.[56]  Specifically, federal employees must initiate administrative review of any alleged discriminatory conduct with the appropriate agency within 45 days of the alleged discriminatory act.[57]  This 45-day period is not jurisdictional,

---

[56] *See Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 832 (1976).
[57] 29 C.F.R. § 1614.105(a)(1); *see* 42 U.S.C. § 2000e-16.

but instead serves as a statute of limitations, and, "like a statute of limitations, [it] is subject to waiver, estoppel, and equitable tolling."[58]  Accordingly, this 45-day period may be extended if the complaining party shows "that he or she did not know and reasonably should not have known that the discriminatory matter or personnel action occurred."[59]

In this case, Plaintiff failed to exhaust his available administrative remedies for his two failure-to-promote claims because he did not contact the EEOC in a timely manner. The record shows that the Macon LCOM and Regional Technician positions were filled on June 7, 2009, and July 19, 2009.[60]  However, Plaintiff did not contact an EEOC counselor regarding these events until October 23, 2009—138 days after Defendant filled the LCOM position and 96 days after it filled the Regional Technician position.[61]  In short, Plaintiff did not initiate administrative review within the 45-day timeframe.  Because Plaintiff has failed to show good cause for tolling the limitations period, these claims are **DISMISSED**.

## II.     Discrimination

Having dismissed Plaintiff's two failure-to-promote claims, the Court addresses the merits of his failure-to-renew claim.  When a plaintiff seeks to prove a Title VII violation through circumstantial evidence, as in this case, the Court's analysis is guided by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*.[62]

---

[58] *Zipes v. Tran World Airlines, Inc.*, 455 U.S. 385, 393 (1982).
[59] 29 C.F.R. § 1614.105(a)(2); *see also Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 551 (11th Cir. 1993).
[60] Def. Ex. 14, p. 3; Def. Ex. 15, p. 3.
[61] *See* Def. Ex. 17, p. 2.
[62] 411 U.S. 792 (1973).  Although Plaintiff offers evidence of stray racial remarks by Proffitt, his former first-line supervisor, and co-managers, this is not direct evidence of discrimination.

Under this framework, a plaintiff must first establish a prima facie case, or "facts adequate to permit an inference of discrimination."[63]  If the plaintiff establishes a prima facie case, this creates an inference of discrimination, and the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions.  If the employer meets this "exceedingly light" burden, then the inference of discrimination is erased, and the burden shifts back to the plaintiff, who must show that the employer's proffered reasons were merely pretext for discrimination.[64]  Importantly, the ultimate burden of persuasion remains on the plaintiff all times.[65]

### 1. *Prima Facie Case*

The elements of a Title VII prima facie case vary depending on both the type of discrimination alleged and the theory an employee uses to prove his case.[66]  In general, a plaintiff must establish that (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-

---

"[R]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination."  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  Proffitt was terminated well before Plaintiff's appointment expired, and Plaintiff offers no evidence that Proffitt or Plaintiff's co-managers had any influence over Defendant's decision not to renew his employment.

[63] *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

[64] *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994).

[65] *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).

[66] *See, e.g., Benson v. Tocco*, 113 F.3d 1203, 1208 (11th Cir. 1997) (listing elements of prima facie cases for reduction in force claims).

situated individual outside his protected class.[67]   Defendant asserts Plaintiff cannot establish a prima facie case because his proposed comparators are not similarly situated individuals outside his protected class.  The Court agrees.[68]

A proper comparator is an employee who is outside the plaintiff's protected class but "similarly situated [to the plaintiff] in all relevant respects."[69]  The Court determines whether employees are similarly situated by evaluating whether they have "very similar job-related characteristics" and "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."[70]  "[T]he quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."[71]

Here, Plaintiff alleges that former Macon LCOM Anthony Proffitt, former Macon Assistant Manager for Field Operations Johnny Aycock, and five other unnamed individuals were similarly situated, outside his protected classes, and received more favorable treatment.[72]   Contrary to Plaintiff's beliefs, Proffitt, Aycock, and some of the five unnamed individuals received less favorable treatment than Plaintiff; these individuals were all terminated for cause, while Plaintiff's employment was simply not

---

[67] *Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

[68] Defendant also asserts that Plaintiff was not qualified for continued employment; however, the Court does not address this assertion.

[69] *Holifield*, 115 F.3d at 1562 (citations omitted).

[70] *MacPherson v. Univ. of Montevallo*, 922 F.2d 766, 774 (11th Cir. 1991).

[71] *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (citation omitted).

[72] Pl. Dep., pp. 84-87.

renewed.[73]   Moreover, Plaintiff has not established that any of these individuals are outside his protected classes.  Finally, none of these individuals are similarly situated to Plaintiff in all relevant respects.

First, Anthony Proffitt, as LCOM, had significantly different job duties than Plaintiff.  Proffitt was Plaintiff's first-line supervisor and had the responsibility of overseeing and managing the entire operation at the Macon ELCO.[74]  Plaintiff states that Proffitt was fired for being "all into what he shouldn't be"; however, the Court has no way of quantifying or qualifying these actions in comparison to Plaintiff's misconduct.[75]

Plaintiff's second designee, Johnny Aycock, is not a proper comparator for similar reasons.  It is undisputed that Aycock, as AMFO, had different job responsibilities than Plaintiff.[76]  Nonetheless, Plaintiff alleges that Aycock was treated more favorably even through "his conduct and performance were subpar."[77]  Although unclear, Plaintiff appears to assert that Aycock was overwhelmed by his responsibilities and could not perform assigned tasks in a satisfactory manner.[78]  Aycock's performance problems are not similar to Plaintiff's managerial issues and personal disputes with co-workers and staff.

---

[73] *See* Pl. Dep., pp. 84, 86-87; Def. Ex. 24, p. 2.  Defendant asserts that Aycock resigned from his position, but Plaintiff states that Aycock was terminated due to his poor performance.  *Compare* Def. Ex. 25, p. 2 [Doc. 17-28] *with* Pl. Dep., p. 85.  For purposes of this Motion, the Court adopts Plaintiff's version of events.

[74] Pl. Dep., pp. 84-85; Def. Ex. 3, pp. 3, 5.

[75] Pl. Dep., p. 84.

[76] Def. Ex. 3, p. 5.

[77] Pl. Dep., p. 85.

[78] *See id.*

Finally, the five unnamed individuals are also not appropriate comparators.  Like Aycock, Plaintiff states that their "productivity and their work product evaluation or work evaluation was not up to par; they were not meeting deadlines."[79]  Again, these failings are not sufficiently similar to Plaintiff's.  Moreover, these individuals all worked in different local census offices and answered to different first-line supervisors than Plaintiff.[80]  As the Eleventh Circuit has stated, "differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of employment discrimination."[81]  Consequently, Plaintiff has not produced a proper comparator.

The Court recognizes that a "plaintiff's failure to produce a comparator does not necessarily doom [his] case."[82]  A plaintiff can still survive summary judgment if he "presents circumstantial evidence that creates a triable issue concerning the employer's intent."[83]  A triable issue of fact exists "if the record, viewed in the light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'"[84]  Plaintiff has not satisfied this standard.[85]  Thus, he fails to make out a prima facie case or create an

---

[79] *Id.* at 86.

[80] *See id.* at 86-87.

[81] *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001).

[82] *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012) (internal quotation omitted).

[83] *Smith v. Lockheed-Martin*, 644 F.3d 1321, 1328 (11th Cir. 2011).

[84] *Id.* (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)).

[85] Proffitt's and co-managers' racial remarks are not sufficient to establish Plaintiff's prima facie case because they were not associated with the events leading to Defendant's decision.  *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 (11th Cir. 1998).

inference of discrimination, and Defendant is entitled to summary judgment.

### 2.   *Legitimate, Nondiscriminatory Reason for Termination*

Assuming, *arguendo*, that Plaintiff could establish a prima facie case, the burden shifts to Defendant to "clearly set forth, through the introduction of admissible evidence, the reason for its adverse employment decision, and that reason must be legally sufficient to justify a judgment for the defendant."[86]  Defendant's burden is "exceedingly light"; an employer need only articulate a reasonable, non-discriminatory basis for its actions.[87]  The employer "need not persuade the court that it was <u>actually</u> motivated by the proffered reasons."[88]

Defendant lists numerous non-discriminatory reasons for not renewing Plaintiff's temporary employment, including his confrontational demeanor, harsh treatment of staff, and insubordinate behavior.  For example, Acting LCOM McWhorter witnessed Plaintiff call his staff "Little Boogers" and line them up "like children" to give them instructions.[89]  On another occasion, McWhorter counseled Plaintiff regarding personal conflicts with co-workers, but Plaintiff failed to improve his conduct.[90]  Because these are all reasons "that might motivate a reasonable employer,"[91] Defendant has satisfied its "exceedingly light" burden of producing legitimate, nondiscriminatory reasons for

---

[86] *Walker v. Mortham*, 158 F.3d 1177, 1184 (11th Cir. 1998) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)) (internal quotation marks omitted).

[87] *Vessels v. Atlanta Ind. Sch. Sys.*, 408 F.3d 763, 769-70 (11th Cir. 2005).

[88] *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012).

[89] Def. Ex. 9, p. 5.

[90] Def. Ex. 12, p. 2; Def. Ex. 9, p. 5.

[91] *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).

terminating Plaintiff's employment.

### 3. *Pretext*

Again, assuming that Plaintiff could meet his prima facie case, he has not produced sufficient evidence, either direct or indirect, that Defendant's reasons for not renewing his employment were pretextual.[92]   Plaintiff largely offers unsupported allegations that have no bearing on his Title VII claims, including several unrelated disagreements with co-workers and supervisors.   Plaintiff's meager record citations suffer from the same defect.

This Court does not sit as a "super-personnel department" over federal employees.[93]   Employers "may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."[94]   Although Plaintiff may take issue with Defendant's decision not to renew his employment, he has not shown that Defendant acted because of his race, color, sex, religion, or national origin.   Accordingly, this claim is **DISMISSED**.

## III.   Retaliation

Title VII's anti-retaliation provision prohibits employers from discriminating against an employee because he opposed a discriminatory employment practice or

---

[92] *Young v. Gen. Foods Corp.,* 840 F.2d 825, 829 (11th Cir. 1998) (internal quotation omitted).
[93] *See Alvarez v. Royal Atl. Dev., Inc.,* 610 F.3d 1253, 1266-67 (11th Cir. 2010).
[94] *Nix v. WLCY Radio/Rahall Commc'ns,* 738 F.2d 1181, 1187 (11th Cir. 1984) (emphasis added); *see Bessemer Carraway Med. Ctr.,* 151 F.3d at 1324, n.16 (noting that employers may make decisions based on mistakes or lies so long as the decision is not based on a discriminatory reason).

participated in EEOC proceedings.[95]  To establish a Title VII retaliation claim, a plaintiff must show that he "engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events."[96]  After the plaintiff establishes the basic elements of a retaliation claim, the Court's analysis follows the same *McDonnell Douglas* burden-shifting framework.[97]

In this case, Plaintiff cannot establish a prima facie case because he did not engage in protected activity.  Instead, Plaintiff appears to allege that Defendant refused to promote him to LCOM or Regional Technician and declined to renew his employment because he opposed co-workers' attempts to hire their friends and sought to enforce Defendant's hiring guidelines by reporting their conduct to his superiors.[98]  "A complaint about an employment practice, however, constitutes protected opposition only if the individual explicitly or implicitly communicates a reasonable belief that the practice constitutes unlawful employment discrimination against a class protected by Title VII."[99]  Although Plaintiff may have opposed improper hiring practices, he did not explicitly or implicitly communicate any concerns about <u>discriminatory</u> hiring practices.  Accordingly, his retaliation claim is also **DISMISSED**.

---

[95] 42 U.S.C. § 2000e-3(a).

[96] *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

[97] *Id.*

[98] *See* Pl. Dep., pp. 82-83; *see also* Complaint, p. 3 [Doc. 1]; First Response, pp. 2-3 [Doc. 21].

[99] *Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010) (employee who complained that city manager was bullying her did not engage in protected activity because there was no communication that employee perceived the conduct to be sexually harassing); *see also Birdyshaw v. Dillards, Inc.*, 308 F. App'x 431, 436-37 (11th Cir. 2009) (where written complaint did not reference discrimination prohibited by Title VII, employee did not engage in protected activity).

## IV.    Hostile Work Environment

"A hostile work environment claim under Title VII is established upon proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment."[100]   At minimum, a plaintiff must show that (1) he belongs to a statutorily-protected class; (2) has been subject to unwelcome harassment; (3) the harassment was based on a protected characteristic, such as race or religion, or based on engagement in protected conduct, such as filing an EEOC grievance; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or direct liability.[101]

Defendant does not dispute that Plaintiff belongs to statutorily-protected classes, that he was subjected to unwelcome harassment, or that it would be responsible for employee or supervisory misconduct.  Instead, Defendant claims that Plaintiff cannot demonstrate a causal connection between workplace harassment and Defendant's protected characteristics or activities, and, in the event there is a connection, the severity or pervasiveness of the harassment does not rise to the level of a hostile work environment claim.  The Court agrees.

---

[100] *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).
[101] *Id.*

Although unclear from his pleadings and responses to the instant Motion, Plaintiff apparently points to the following incidents as evidence of a hostile work environment: (1) Former LCOM Anthony Proffitt and Assistant Manager for Recruiting Bob Peterson told Plaintiff that they "…would like nothing more than to 'take [Plaintiff] out back and beat the shit out of [him]'"[102]; (2) Proffitt failed to reprimand staff and co-workers who were insubordinate to Plaintiff; (3) Peterson stated that he would slap Plaintiff if Plaintiff received a promotion[103]; (4) Peterson and Assistant Manager for Technology Mickey Bumpass called Plaintiff a "nigger" and an "uppity nigger" who had "too much" "authority and power"[104]; (5) Another employee told Plaintiff that Proffitt and other managers used racial epithets in reference to the ELCO staff[105]; and (6) Peterson created "a half dozen work place disturbances" by openly cursing at Plaintiff for his job performance and causing "discord and resentment" in the office.[106]

As an initial matter, Plaintiff has not demonstrated that Proffitt or Peterson threatened physical violence and caused other "work place disturbances" because of Plaintiff's protected characteristics or participation in a protected activity.[107]   To the contrary, Plaintiff repeatedly asserts that these individuals (and others) took issue with his stalwart enforcement of workplace policies.  He emphasizes that Proffitt was "upset

---

[102] Def. Ex. 27, p. 2.

[103] *Id.*; Pl. Dep., p. 58 [Doc. 19].

[104] Pl. Dep., p. 56.

[105] Def. Ex. 27, p. 3.

[106] *Id.* at 2.

[107] *See, e.g., Cobb v. City of Roswell, Ga. ex rel. Wood*, 533 F. App'x 888, 897 (11th Cir. 2013).

by me often pointing out (in private and yet respectfully) that what he wanted to do [hiring friends] was not in line with Census policies, procedures or manuals.  He told me that he was use [sic] to doing things his way and would not go by the book when his way made more sense to him."[108]   Plaintiff further explains that his co-workers' "hostility magnified many times over after [Proffitt] was terminated due to matters initially brought to [the Area Manager's] attention by [Plaintiff]."[109]   Although Proffitt and Peterson's threats and misconduct were unquestionably deplorable, "[p]ersonal animosity is not the equivalent of ... discrimination and is not proscribed by Title VII."[110]  Thus, these incidents do not support Plaintiff's hostile work environment claim.

In addition, the Court concludes that Plaintiff's co-workers' and supervisor's racial epithets were not sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and create a discriminatorily abusive working environment.  To satisfy this element, a plaintiff must meet both an objective component and a subjective component: the harassing behavior "must result in both an environment that a reasonable person would find hostile or abusive" and an environment that "the victim subjectively believes to be abusive."[111]   The Court analyzes the objective component by looking at the totality of the circumstances, including the frequency of the discriminatory

---

[108] Def. Ex. 27, p. 2.

[109] *Id.*

[110] *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986); *see also Alexander v. Opelika City Schools,* 352 F. App'x 390 (11th Cir. 2009) ("[N]one of the alleged <u>racial comments</u> contained threats of physical violence, and [plaintiff] did not demonstrate that the comments interfered with his job performance.") (emphasis added).

[111] *Miller*, 277 F.3d at 1275.

conduct, its severity, whether the discriminatory conduct was physically threatening or humiliating or instead was just a mere offensive utterance, and whether the conduct unreasonably interfered with an employee's work performance.[112]

A survey of relevant case law reveals that Plaintiff's allegations do not satisfy the objective component of the Court's analysis.  For example, in *Barrow v. Georgia Pacific Corporation*,[113] the plaintiff observed displays of the rebel flag on tool boxes and hard hats, the letters "KKK" on a bathroom wall and on a block-saw console, and a noose in another employee's locker.  A superintendent called the plaintiff a "nigger" three times in one year, repeatedly called him "boy," and told him two or three times that he was going to kick his "black ass."  Yet another superintendent called the plaintiff a "black boy," and the plaintiff's supervisor called him a "nigger" and told him that if he looked at "that white girl" he would "cut" him.[114]  Despite the discriminatory and offensive nature of these symbols and slurs, the Eleventh Circuit Court of Appeals ultimately concluded that the plaintiff "d[id] not meet the standard of severe and pervasive harassment."[115]

Plaintiff's case does not rise to the level of harassment in *Barrow* and cannot form a hostile work environment claim.  Proffitt, Peterson, and Bumpass's use of racial epithets on two occasions does not constitute such "commonplace, overt and denigrating

---

[112] *Harris v. Forklift Sys., Inc.*, 50 U.S. 17, 23 (1993).
[113] 144 F. App'x 54 (11th Cir. 2005).
[114] *Id*. at 57.
[115] *Id*. at 58.

[statements] that they create an atmosphere charged with racial hostility."[116]   Although

these racially-charged statements were clearly offensive, they were not humiliating or

made in a threatening manner.   Moreover, Plaintiff does not allege that these events

adversely affected his work performance.   In fact, he states that he "performed [his]

duties despite various schemes and efforts by other managers loyal to [Proffitt] who

resented [him] for [Proffitt's] termination."[117]   Consequently, Plaintiff's allegations do not

to meet the Eleventh Circuit's stringent standard for hostile work environment claims.

Thus, Plaintiff's hostile work environment claim is also **DISMISSED**.

CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. 17] is

**GRANTED**.

   **SO ORDERED**, this 27th day of February, 2014.


            S/  C. Ashley Royal
            C. ASHLEY ROYAL, CHIEF JUDGE
            UNITED STATES DISTRICT COURT

BBP/ssh

---

[116] *See Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1521 (11th Cir. 1995); *see also Smith v. Beverly Health & Rehab. Serv., Inc.*, 978 F. Supp. 116, 1122 (N.D. Ga. 1997) (supervisor's comments that "all that mooly can do is make coffee and bring it to me," "these goddam Georgia niggers think they own Georgia," and "where I come from niggers knew their place," did not rise to the level of severe or pervasive racial harassment).

[117] Def. Ex. 27, p. 3.